# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## BID PROTEST

---

### Number 09-411C
### Senior Judge John P. Wiese

---

**PAI CORPORATION,**

**Plaintiff,**

v.

**THE UNITED STATES,**

**Defendant,**

and

**INNOVATIVE TECHNOLOGY PARTNERSHIPS, LLC,**

**Defendant-Intervenor.**

---

### PLAINTIFF'S CONSOLIDATED RESPONSE AND REPLY

---

Cyrus E. Phillips IV
Colonial Place I
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201-3052
Attorney of record for Plaintiff, PAI Corporation.

AGREED-UPON REDACTED COPY
MAY BE MADE PUBLIC

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii-iii

ARGUMENT ......................................................................................................................................... 1-16

I.     PLAINTIFF HAS BEEN PREJUDICED BY THE UNREMEDIED INFORMATIONAL DEFICIENCIES
WHICH HERE EXISTED ................................................................................................ 1-7

II.     THE NONPUBLIC INFORMATION TO WHICH DEFENDANT-INTERVENOR ALONE
HAD ACCESS WAS COMPETITIVELY USEFUL ......................................................... 7-8

III.    THE CONTRACTING OFFICER'S RELIANCE ON DEFENDANT-INTERVENOR'S FIREWALL
TO RESOLVE THE POTENTIAL ORGANIZATIONAL CONFLICT OF INTEREST CREATED BY
DEFENDANT-INTERVENOR'S CONTRACT WITH OST'S PROGRAM OFFICE OF INDEPENDENT
OVERSIGHT WAS UNAUTHORIZED. ............................................................................ 9

IV.    THE DEFINITION OF "OFFEROR" IN THIS SOLICITATION DOES NOT EXTEND THE CONCEPT
OF A "CONTRACTOR TEAM ARRANGEMENT" TO AN OFFER SUBMITTED BY A
SINGLE PRIME CONTRACTOR ...................................................................................... 10-13

V.     THE TECHNICAL REPRESENTATIVE'S COST REALISM ADJUSTMENT OMITS THE
REQUIRED "SHOULD COST" ANALYSIS ..................................................................... 13-17

CERTIFICATE OF SERVICE ............................................................................................................... 18

**TABLE OF AUTHORITIES**

*STATUTES*

41 U.S.C. § 253b(d)(3)........................................................................12

*REGULATIONS*

13 C.F.R. 121.103(e), (f), (h).................................................................10

13 C.F.R. 121.103(h)(4)....................................................................10-11

Federal Acquisition Regulation 9.504(a)(1)..................................................4

Federal Acquisition Regulation 9.504(a)(2)..................................................4

Federal Acquisition Regulation 9.506(b)......................................................4

Federal Acquisition Regulation 9.506(b)-(d).................................................9

Federal Acquisition Regulation 9.601.........................................................10

Federal Acquisition Regulation 9.601(1)..................................................10, 11

Federal Acquisition Regulation 9.601(2).....................................................10

Federal Acquisition Regulation 15.305(a)....................................................12

Federal Acquisition Regulation 15.404(d)(2)(i)..............................................14

*CASES*

*Ashbritt, Inc. v. United States*,
 No. 08-473C, 2009 U.S. Claims LEXIS 227,
 (Fed. Cl. June 25th, 2009).................................................................12

*ARINC Engineering Services, LLC v. United States,*
77 Fed. Cl. 196 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Banknote Corporation of America, Inc. v. United States,*
56 Fed. Cl. 377 (2007),
*aff'd,* 365 F.3d 1345 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Blackwater Lodge & Training Center, Inc. v. United States,*
86 Fed. Cl. 488 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12-13

*Johnson Controls World Services, Inc.,*
B-286714.2, February 13th, 2001,
*2001 U.S. Comp. Gen. LEXIS 1.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 4

*Filtration Development Company, LLC v. United States,*
60 Fed. Cl. 371 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

*Lumetra v. United States,*
84 Fed. Cl. 542 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*OMV Medical, Inc. v. United States,*
219 F.3d. 1337 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*SGT, Inc.,*
B-294722.4, July 28th, 2005,
*2005 U.S. Comp. Gen. LEXIS 139.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*SOS Interpreting, LTD,*
B-293026, B-293026.2, B-293026.3, January 20th, 2004,
*2004 U.S. Comp. Gen. LEXIS 281.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Triax Pacific, Inc. v. West,*
130 F.3d 1469 (Fed. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

---

ARGUMENT

---

**I. Plaintiff Has Been Prejudiced by the Unremedied Informational Deficiencies Which Here Existed.**

Defendant argues that Plaintiff has not been prejudiced by the unremedied informational deficiencies which here existed because Plaintiff itself is the author of Plaintiff's lower score on the Technical Approach to Task Orders Criterion.[*] But the Contracting Officer shows us otherwise, that this lower score for Plaintiff on the Technical Approach to Task Orders Criterion in fact results from differences among the three sample Task Orders, differences resulting from the Contracting Officer's authorship of sample Task Order 3.

The Contracting Officer explains that for sample Task Order 3, i.e., three different Scenarios under the "Contractor Transportation and Utilization Program (CTUP):"

---

[*] 

Administrative Record, at 001800.

**Agreed-Upon Public Copy**

- 1 -

not only did I provide offerors with very specific information for three fictitious trans-
portation scenarios, I provided offerors information regarding the number of drivers
and transportation assets needed to complete each scenario as well as trip duration and
locations.

Administrative Record, at 001931.

Contrast this sample Task Order 3 and the detailed information provided by the Contracting

Officer for sample Task Order 3 with sample Task Order 1, "Conduct Agent Candidate Training

(ACT) for CY [Calendar Year] 2009," and with sample Task Order 2, "Support Operational

Readiness Training (ORT) Events for CY 2009." As it turns out, sample Task Order 1 and sample

Task Order 2 are yearly, recurring training events which are conducted several times each year by

Defendant-Intervenor's proposed subcontractor, Wackenhut. Administrative Record, at 001440,

001460.

Now look at the rating of Plaintiff's Competitive Proposal on the Technical Approach to Task

Orders Criterion—here, it is obvious that Plaintiff's response to sample Task Order 3 was

significantly better received by the single Technical Representative, the Manager of OST's Office

of Training and Logistics, than Plaintiff's response to sample Task Order 1, or to sample Task

Order 2—there are no weaknesses, or significant weaknesses, observed for Plaintiff's response to

sample Task Order 3, and this is the sample Task Order where the Contracting Officer, in her

own words, provided "very specific information" which she did not provide for sample Task Order 1 or for sample Task Order 2. Administrative Record, at 001800 through 001803.

We see here both the result of the unremedied informational deficiencies in sample Task Order 1 and in sample Task Order 2 and the ready availability of a remedy to these informational deficiencies, the "very specific information" provided by the Contracting Officer for sample Task Order 3. Had this sort of information been provided as well for sample Task Order 1 and for sample Task Order 2 prior to receipt of initial Competitive Proposals, there would not have been an unequal access to information Organizational Conflict of Interest. But this was not to be.

This is the same situation which existed, a situation which was remedied after a Post-Award Procurement Protest, in *Johnson Controls World Services, Inc.*, B-286714.2, February 13th, 2001, *2001 U.S. Comp. Gen. LEXIS 1*. There one of the Offerors, the incumbent, had access to nonpublic information—detailed work order information—that was not available to the other Offerors and would enable one to "refine and reduce staffing levels significantly beyond what would be possible using the [Solicitation] information alone," nonpublic information which "could be useful in determining the nature of the work performed in far greater detail than would be possible otherwise." *Id., 2001 U.S. Comp. Gen. LEXIS 1, *12 through *13.*

Federal Acquisition Regulation 9.504(a)(1) requires that Contracting Officers "[i]dentify and evaluate potential organizational conflicts of interest *as early in the acquisition process as possible*." (Emphasis added). Federal Acquisition Regulation 9.504(a)(2) requires that Contracting Officers "[a]void, neutralize, or mitigate significant *potential conflicts* before contract award." (Emphasis added). Federal Acquisition Regulation 9.506(b) requires that before a Solicitation is issued Contracting Officers shall analyze and document in writing a course of action to "avoid, neutralize, or mitigate" "*significant potential organizational conflict[s] of interest.*" (Emphasis added). The key here is that these duties extend beyond *actual* conflicts—these duties require Contracting Officers to document a plan to avoid, neutralize, or mitigate *even apparent, or potential,* conflicts of interest *before* a Solicitation is issued.

Because the *Johnson Controls World Services* Contracting Officer took no such action to mitigate this unfair competitive advantage, *Id., 2001 U.S. Comp. Gen. LEXIS 1, *18 through *19,* the Government Accountability Office sustained the Post-Award Protest and disqualified the incumbent from the Competition, *Id., 2001 U.S. Comp. Gen. LEXIS 1, *29.*

Here Defendant expected as early as April 8th, 2008 that Defendant-Intervenor would compete for the successor OST support services Task Order Contract and that Defendant-Intervenor would team with the incumbent large business, Wackenhut. Administrative Record, at 000486.

And at first Defendant decided not to use sample Task Orders. Administrative Record, at 002087. But Defendant later changed its collective mind, decided that the competition for the successor OST support services Task Order Contract would be determined through a review of the responses to three sample Task Orders, and two of these three sample Task Orders reflected yearly, recurring training events which are conducted several times each year by Defendant-Intervenor's proposed subcontractor, Wackenhut. Defendant knew, or should have known, that as the incumbent audits/assessments Contractor for OST's Program Office of Independent Oversight, Defendant-Intervenor had had access to the details of just how Wackenhut or other OST Contractors performed particular work or a Task Order. And Wackenhut, the incumbent large business, had had access to nonpublic information about the performance details of the OST support services Task Order Contract.

But Defendant did nothing to mitigate the unfair competitive advantage created for Defendant-Intervenor with sample Task Order 1 and with sample Task Order 2 before receipt of initial Competitive Proposals on October 8th, 2008. The Contracting Officer then made no Conflict Analysis. Indeed, the Contracting Officer made no written analysis of Organizational Conflicts of Interest until June 8th, 2009, this after Defendant had promised the Government Accountability

Office "Corrective Action" in response to the Post-Award Procurement Protest filed by Advanced Technologies and Laboratories International, Incorporated (ATL).

In this Post-Award Procurement Protest of January 12th, 2009 ATL challenged the unfair competitive advantage created through unequal access to information when Defendant used three sample Task Orders to evaluate Competitive Proposals, sample Task Orders which Wackenhut, a large business, had already performed and for which Wackenhut had detailed technical and actual Cost information that it could share with its small business teaming partner, Defendant-Intervenor. Likewise, ATL observed that as the incumbent audits/assessments Contractor for OST's Program Office of Independent Oversight, Defendant-Intervenor had had access to the details of just how Wackenhut or other OST Contractors performed particular work or a Task Order. Administrative Record, at 002048 through 002051.

By the time this Contracting Officer got around to her Conflict Analysis in June 2009, Defendant had already declared Defendant-Intervenor the winner of the competition for the successor OST support services Task Order Contract. And the "Corrective Action" promised by Defendant to the Government Accountability Office did not include any actions which could have mitigated the unfair competitive advantage created for Defendant-Intervenor through the evaluation of responses to sample Task Order 1 and sample Task Order 2—there were no Discussions and no

Competitive Proposal was modified by any Offeror. Indeed, there were no changes to any of the thirty-two discrete scores recorded by single Technical Representative, an OST Manager, on the four Technical and Management evaluation Criteria. Administrative Record, at 001824.

It does not matter that ATL's responses to the three sample Task Orders were better received than Plaintiff's responses to the three sample Task Orders— █████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████. Administrative Record, at 001774. While ATL suffered from the same informational deficiencies as did Plaintiff, ATL's score on the Technical Approach to Task Orders Criterion was nonetheless lower than Defendant-Intervenor's score on the Technical Approach to Task Orders Criterion even though ATL's score was better than Plaintiff's score on the Technical Approach to Task Orders Criterion. This better score for Defendant-Intervenor on the Technical Approach to Task Orders Criterion reflects Defendant-Intervenor's unfair competitive advantage. *Cf. ARINC Engineering Services, LLC v. United States*, 77 Fed. Cl. 196, 206 (2007).

## II. The Nonpublic Information to Which Defendant-Intervenor Alone Had Access Was Competitively Useful.

Defendant adopts the Contracting Officer's post hoc rationale of June 8th, 2009, this that Wackenhut's recurring performances of sample Task Order 1 and of sample Task Order 2 were

not "competitively useful," Administrative Record, at 001937; Defendant's Cross-Motion, July 29th, 2009, at 21. Perhaps Defendant has not read Defendant-Intervenor's Technical Proposal and Defendant-Intervenor's responses to sample Task Order 1 and to sample Task Order 2, for here Defendant-Intervenor emphasizes, in the very first paragraph of its response to sample Task Order 1, Administrative Record, at 001440, and in the very first paragraph of its response to sample Task Order 2, Administrative Record, at 001460, just these Wackenhut recurring performances of sample Task Order 1 and of sample Task Order 2. And Defendant admits that the details about these Wackenhut performances is nonpublic information which Defendant has elected not to disclose to the other Offerors. Defendant's Cross-Motion, July 29th, 2009, at 25.

More to the point, and this as a result of Defendant's failure to resolve or mitigate with a documented Conflicts Analysis prior to issuing the Solicitation the not insignificant *potential* Organizational Conflict of Interest which arose from Defendant's selection of sample Task Order 1 and of sample Task Order 2 for the evaluation of initial Competitive Proposals, there is a presumption that Defendant-Intervenor specifically benefited from this nonpublic information. This presumption is rebutted neither by the Contracting Officer's post hoc Conflict Analysis nor by Defendant-Intervenor's less than perfect score on the Technical Approach to Task Orders Criterion. *Filtration Development Company, LLC v. United States*, 60 Fed. Cl. 371, 379 (2004).

**III. The Contracting Officer's Reliance on Defendant-Intervenor's Firewall to Resolve the Potential Organizational Conflict of Interest Created by Defendant-Intervenor's Contract With OST's Program Office of Independent Oversight Was Unauthorized.**

The Contracting Officer relies on Defendant-Intervenor's firewall—said to have been in place since January 2004—to mitigate any potential Organizational Conflict of Interest created by Defendant-Intervenor's performance as the incumbent audits/assessments Contractor for OST's Program Office of Independent Oversight, a performance giving Defendant-Intervenor access to the details of just how Wackenhut or other OST Contractors performed particular work or a Task Order. Administrative Record, at 001940 through 001941.

This reliance was unauthorized—Federal Acquisition Regulation 9.506(b)-(d) requires that such measures by approved by the Chief of the Contracting Office (or a higher level Agency official) and that such approvals be obtained before the Solicitation is issued. This Contracting Officer did not document this supposed firewall until June 2009—the Solicitation was issued on August 29th, 2008—and there is nothing in this Administrative Record which reflects approval of this mitigation measure by the Chief of the Contracting Office (or a higher level Agency official) on or before that date. This is arbitrary and capricious Agency action in violation of regulation. *Filtration Development,* 60 Fed. Cl., at 378.

**IV. The Definition of "Offeror" in this Solicitation Does Not Extend the Concept of a "Contractor Team Arrangement" to an Offer submitted by a Single Prime Contractor.**

Defendant looks to the Solicitation's definition of "Offeror" and the Solicitation's incorporation of the term "contractor team arrangement" as it is set out in Federal Acquisition Regulation 9.601, Administrative Record, at 000045, as validating the Source Selection Authority's otherwise unlawful evaluation of Defendant-Intervenor's initial Competitive Proposal on the Corporate Experience Criterion as "superior" "because ITP's [Defendant-Intervenor's] subcontractor, WSI [Wackenhut], as the incumbent contractor has provided similar services required by this solicitation successfully for the past five years." Administrative Record, at 001828 through 001829.

Yes, it is true that Federal Acquisition Regulation 9.601 defines a "contractor team arrangement," but there are two different Contractor team arrangements included within this concept. The first is a Contractor team submitting an Offer as a partnership or joint venture, Federal Acquisition Regulation 9.601(1), and the second is a Contractor team submitting an Offer through a single prime Contractor with one or more subcontractors, Federal Acquisition Regulation 9.601(2).

There is a key difference in these two different Contractor team arrangements: on an Offer submitted by a Contractor team as a partnership or joint venture, the individual legal entities comprising the Contractor team are deemed affiliated and their average annual gross receipts (or number of employees) are aggregated for Size Determination purposes. 13 C.F.R. 121.103(e), (f), (h). On an Of-

fer submitted by a Contractor team through a single prime Contractor with one or more proposed subcontractors, the individual legal entities comprising the Contractor team are not deemed affiliated and their average annual gross receipts (or number of employees) aggregated unless one of the proposed subcontractors in fact controls the enterprise and thus is only an "ostensible" subcontractor. 13 C.F.R. 121.103(h)(4).

ATL challenged Defendant-Intervenor's Small Business Size status in January 2009. The United States Small Business Administration ruled in a formal Size Determination issued on January 28th, 2009 that Defendant-Intervenor is a single prime Contractor and a Small Business and that Wackenhut is not Defendant-Intervenor's "ostensible" subcontractor. Administrative Record, at 002069 through 002078. So Federal Acquisition Regulation 9.601(1) is inapplicable here, and thus the specific and recent experiences and an explanation of the depth of these experiences asked for by the Corporate Experience Criterion can only apply to Defendant-Intervenor, the sole "Offeror," and not also to Wackenhut, the incumbent OST support services Task Order Contractor.

Defendant "coached" Defendant-Intervenor on how to avoid the "ostensible subcontractor" problem (hire the Wackenhut incumbents), Administrative Record, at 002084, and Defendant was successful, just as the United States Small Business Administration's formal Size Determination confirms.

The Source Selection Authority's evaluation of Defendant-Intervenor's initial Competitive Proposal on the Corporate Experience Criterion is unlawful and a violation of 41 U.S.C. § 253b(d)(3) and Federal Acquisition Regulation 15.305(a) because this evaluation uses a significantly different basis in evaluating the relative quality of Defendant-Intervenor's initial Competitive Proposal than that which was publicly disclosed and embodied in the Solicitation itself. *Ashbritt, Inc. v. United States*, No. 08-473C, *2009 U.S. Claims LEXIS 227, *82* (Fed. Cl. June 25th, 2009); *Banknote Corporation of America, Inc. v. United States*, 56 Fed. Cl. 377, 386-387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Defendant-Intervenor asserts that the Solicitation "[████████████████████████████████████]" Criterion, and thus that it was incumbent on Plaintiff to inquire about these conflicts before the submission of initial Competitive Proposals on October 8th, 2008 in order to now complain about the Source Selection Authority's evaluation of Defendant-Intervenor's initial Competitive Proposal on the Corporate Experience Criterion. Defendant-Intervenor's Cross-Motion, at 30, July 29th, 2009. But even if there were "conflicting signals" about the Corporate Experience Criterion, and Plaintiff does not concede that there were, these "conflicting signals" must have been so patent and glaring "that it [would have been] unreasonable for a contractor not to

discover and inquire about them." *Blackwater Lodge & Training Center, Inc. v. United States*, 86 Fed.

Cl. 488, 504-505 (2009), *citing Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997).

In this Civil Action, arguing that the specific and recent experiences and an explanation of the depth of these experiences asked for by the Corporate Experience Criterion can apply only to Defendant-Intervenor and not to Wackenhut, the incumbent OST support services Task Order Contractor, does not create such an "obvious, gross [or] glaring ambiguity" as to require the prophylactic hygiene of a pre-Opening inquiry.

**V. The Technical Representative's Cost Realism Adjustment Omits the Required "Should Cost" Analysis.**

Defendant supposes that Plaintiff lacks a proper understanding of the Cost Realism analysis process when Plaintiff says that it was improper and unlawful that the Technical Representative increased Plaintiff's proposed Costs for those labor categories which Plaintiff offered at less than the minimum wage rates set by the U.S. Department of Labor but at the same time the Technical Representative did not likewise reduce proposed Costs for those labor categories which Plaintiff has offered at rates above the minimum wage rates set by the U.S. Department of Labor. Defendant's Cross-Motion, July 29th, 2009, at 37-38.

Plaintiff does not contend that the Technical Representative was wrong when he increased Plaintiff's proposed Costs for those labor categories which Plaintiff offered at less than the minimum

wage rates set by the U.S. Department of Labor. Rather, the violation of statute and regulation here is that the Technical Representative did not at the same time reduce proposed Costs for those labor categories which Plaintiff has offered at rates above the minimum wage rates set by the U.S. Department of Labor.

The Defense Contract Audit Agency on November 6th, 2008 provided to Defendant, ergo to the Technical Representative, an Audit Report detailing the precise amounts by which Plaintiff's proposed Costs in certain labor categories were overstated. Administrative Record, at 001739. But the Technical Representative's Cost Realism adjustment implements only a part of this Defense Contract Audit Agency Audit Report, i.e., the Technical Representative implements Cost Realism adjustments only for the understatements, and not for the overstatements.

Agency Cost Realism and Cost Evaluation must take into account *all* the available information and these analyses must not make irrational assumptions or arbitrary conclusions. *Lumetra v. United States*, 84 Fed. Cl. 542, 560 (2008), citing *OMV Medical, Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000). An element of an Agency Cost Realism analysis is that it "must reflect the Government's best estimate of the cost of any contract that is *most likely to result* from the offeror's proposal," Federal Acquisition Regulation 15.404-1(d)(2)(i). (Emphasis added); *Lumetra*, 84 Fed. Cl., at 561.

This is sometimes referred to as a "should cost" analysis, and in making it an Agency must assume reasonable economy and efficiency. *SGT, Incorporated*, B-294722.4, *2005 U.S. Comp. Gen. LEXIS 139, *14*, July 28th, 2005. A proper "should cost" analysis must evaluate proposed Costs equally, and an "apples and oranges" Cost evaluation is "inherently improper." *SOS Interpreting, LTD*, B-293026, B-293026.2, B-293026.3, *2004 U.S. Comp. Gen. LEXIS 281, *27-*28*, January 20th, 2004.

Here the Technical Representative ignores available information when he increases Plaintiff's proposed Costs for those labor categories which Plaintiff has offered at less than the minimum wage rates set by the U.S. Department of Labor but the Technical Representative does not likewise reduce proposed Costs for those labor categories which Plaintiff has offered at rates above the minimum wage rates set by the U.S. Department of Labor. This is an irrational Cost Realism analysis because it ignores available information, the Defense Contract Audit Agency Audit Report, and this is a prohibited "apples and oranges" Cost Realism analysis—the increased Costs added to Plaintiff's Cost proposal must be offset against a decrease in proposed Costs to account for those labor categories which Plaintiff has offered at rates above the minimum wage rates set by the U.S. Department of Labor—only after such an adjustment is made will Defendant have the Cost *most likely to result* from Plaintiff's Cost Proposal.

The Technical Representative implements a Cost Realism adjustment only for the understate-ments of Plaintiff's proposed direct labor rates [█████████████████████████████████████████████████████████████████████████████]. Administrative Record, at 001739. The Technical Representative did not implement a Cost Realism adjustment for Plaintiff's proposed and overstated direct labor rates [████████████████████████████████████████████████████████████████████████████████████████████████]. Administrative Record, at 001739.

Plaintiff proposed a total of [█████████████████████████████████████████████████████████████████████]. Administrative Record, at 000885, 000888, 000898, 000901. The result is an overstatement of proposed direct labor rates of almost $214,000 which is not recognized in the Technical Representative's Cost Realism adjustment.

Respectfully submitted,

/s/ Cyrus E. Phillips IV
_____
Cyrus E. Phillips IV

Virginia State Bar Number 03135

**Agreed-Upon Public Copy**

August 5th, 2009

Colonial Place I
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201-3052

Telephone:       (703) 351-5044
Facsimile:       (703) 351-9292
Electronic Mail:    [lawyer@procurement-lawyer.com](mailto:lawyer@procurement-lawyer.com)

Attorney of record for Plaintiff,
PAI Corporation.

I hereby certify, under penalty of perjury, that on Wednesday, August 5th, 2009 a true and complete copy of this Plaintiff's Consolidated Response and Reply was filed electronically via the Court's Electronic Case Filing System, through which notice of this filing will be sent to:

Jane C. Dempsey, Esq.

Electronic Mail:     Jane.Dempsey@usdoj.gov

Attorney of record for Defendant,
U.S. Department of Energy.

I also certify, under penalty of perjury, that on Wednesday, August 5th, 2009 a true and complete copy of this Plaintiff's Consolidated Response and Reply was filed electronically via the Court's Electronic Case Filing System, through which notice of this filing will be sent to:

Richard J. Webber, Esq.

Electronic Mail:     webberr@arentfox.com

Attorney of record for Defendant-Intervenor,
Innovative Technology Partnerships, LLC.

/s/ Cyrus E. Phillips IV

_____

Cyrus E. Phillips IV

**Agreed-Upon Public Copy**