# In the United States Court of Federal Claims

No. 09-411C
Filed: September 14, 2009
Reissued: September 17, 2009[*/]

|  |  |  |
|---|---|---|
| PAI CORPORATION, | ) | <u>Post-Award Bid Protest</u>: A motion for a permanent injunction will not be granted where the contracting officer adequately addressed any potential organizational conflicts of interest and where plaintiff failed to show that either the agency's inclusion of subcontractors in its evaluation of corporate experience or the agency's cost realism analysis was arbitrary or capricious. |
|           Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
|           Defendant, | ) | |
| and | ) | |
| INNOVATIVE TECHNOLOGY PARTNERSHIPS, LLC, | ) | **REDACTED VERSION** |
|           Defendant-Intervenor. | ) | |

_____ <u>Cyrus E. Phillips IV</u>, Arlington, Virginia, counsel for plaintiff.

_____ <u>Jane C. Dempsey</u>, with whom were <u>Assistant Attorney General Tony West</u>, <u>Director Jeanne E. Davidson</u>, and <u>Assistant Director Martin</u>

---

[*/] The court originally issued this order under seal on September 14, 2009, pursuant to the protective order entered in this case on June 26, 2009. After a review of the redactions proposed by the parties, the court is reissuing a redacted version of the order in conformance with the E-Government Act of 2002.

<u>F. Hockey, Jr.</u>, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel for defendant.   <u>Don Crocket</u> and <u>Anh Nguyen</u>, U.S. Department of Energy, of counsel.

<u>Richard J. Webber</u>, Arent Fox LLP, Washington, DC, counsel for defendant-intervenor.  <u>Lisa K. Miller</u> and <u>Kavitha J. Babu</u>, of counsel.

## OPINION

<u>WIESE</u>, Judge.

Plaintiff, PAI Corporation, a disappointed bidder in a procurement for nuclear-transport training support services, sues here to set aside the award of a contract to Innovative Technology Partnerships, LLC ("ITP"), the intervenor in this action, by the United States Department of Energy ("DOE").   Plaintiff contends that DOE's decision to award the contract to ITP was arbitrary and capricious because DOE failed to mitigate ITP's allegedly unfair competitive advantage resulting from ITP's access to nonpublic information through its subcontractor Wackenhut Services, Inc.   ("Wackenhut") and through its own performance as the incumbent contractor for DOE's Program Office of Independent Oversight ("the POIO contract").   Plaintiff additionally alleges that the award was arbitrary and capricious because DOE impermissibly considered the corporate experience of the various subcontractors and incorrectly evaluated plaintiff's cost proposal.

The case is now before the court on the parties' cross-motions for judgment on the administrative record.  The parties have fully briefed the issues and the court heard oral argument on August 26, 2009.  At the conclusion of the argument, the court announced a tentative ruling in defendant's favor but explained that it would further study the record in light of the arguments presented before issuing a final decision.  For the reasons set forth below, we now affirm our earlier ruling and grant defendant's and defendant-intervenor's cross-motions for judgment on the administrative record.

2

FACTS

DOE's Office of Secure Transportation ("OST"), a division of DOE's National Nuclear Security Administration, is responsible for the safe and secure transport of nuclear weapons, special nuclear materials, and weapon components between production facilities and Department of Defense facilities via ground and air transportation. In support of this mission, DOE issued a solicitation on August 29, 2008, to provide training support services to OST for a range of operational and administrative activities. The solicitation called for an indefinite-delivery, indefinite-quantity, cost-plus-award-fee type contract for a base period of two years, with two 18-month option periods. The guaranteed minimum under the contract was $3 million with an estimated ceiling of $95 million. Although the incumbent contractor for the support services contract, Wackenhut, was a large business concern, DOE limited the instant procurement to small businesses.

As part of the solicitation, offerors were instructed to submit a cost proposal for three sample task orders to enable DOE to determine whether the "proposed costs are reasonable, realistic, and reflect a clear understanding of the solicitation requirements." The first sample task order directed offerors to "Conduct Agent Candidate Training for [Calendar Year] 2009." The second sample task order further instructed offerors to "Support Operational Readiness Training for [Calendar Year] 2009." The third sample task order provided offerors with three different scenarios under the "Contractor Transportation and Utilization Program" and required offerors to provide personnel to move vehicles between OST facilities. Offerors were directed to price each of the sample task orders separately and to include estimated direct productive labor hours, direct labor rates, indirect rates, travel and other direct costs, and an award fee as part of their cost proposal.

The solicitation provided that a cost realism analysis would be used to establish each offeror's total probable cost for the best value evaluation. The total probable cost was defined as the sum of the probable cost for the three sample task orders and a total award fee.

Offerors were additionally informed that DOE, in conducting its cost realism analysis, might adjust an offeror's proposed costs to reflect any additions or reductions in cost elements to realistic levels.[2]

The solicitation contained a Source Evaluation Plan setting forth the procedures for DOE's evaluation of proposals.  Pursuant to these procedures, DOE established an Integrated Project Team consisting of the contracting officer, a technical representative, and a legal advisor, who in turn were supported by technical advisors, business advisors, and "ex-officio" members.  Under the Source Evaluation Plan, the technical representative was charged with evaluating the proposals with respect to their technical approach, key personnel, corporate experience, and past performance, including identifying strengths, weaknesses, deficiencies, and risks in each of those areas.  The contracting officer was in turn given responsibility for evaluating each offeror's cost proposal, including conducting a cost realism analysis for each bid. Following the Project Team's evaluation, the technical representative was required to brief the contracting officer and the Source Selection Authority on the results of the evaluation without making any recommendation for award.

On July 30, 2008, one month before the issuance of the solicitation, DOE launched the OST Support Services Contract website which provided links titled "Reading Room," "Questions and Answers," and "Miscellaneous."  Through these links, offerors could obtain information about the upcoming OST support services procurement.  In "Reading Room," DOE publicly released the existing OST support services contract being performed by Wackenhut, including the contract's Performance Work Statement.  In addition, the "Reading Room" link also provided documents and information from DOE's Industry Day conference, including the attendance roster, the briefing

---

[2] As explained in its "Technical Evaluation of Cost," DOE first developed a baseline for staffing and other direct costs specific to each task order.  This baseline was created using the expert judgments of a technical representative and OST technical advisors who relied upon their direct working knowledge of OST requirements applicable to the three sample task orders as well as historical data.  DOE used this baseline in the cost realism analysis as an objective standard against which it could measure the realism of each offeror's proposed costs.

packages explaining the OST command structure, mission, and logistics and property management, documents addressing federal agent readiness training in the areas of Agent Candidate Training and Operation Readiness Training, and the results of a question-and-answer session.

Nine offerors, including plaintiff and ITP, submitted timely proposals. In its proposal, ITP indicated its intention to employ Wackenhut—the incumbent contractor for the OST support services contract—as a subcontractor. ITP further advised that it planned to retain a number of Wackenhut's key personnel for performance of the contract.

On December 17, 2008, after completing its evaluation of the proposals, the Project Team documented its findings in a final evaluation report and briefed the Source Selection Authority. On December 22, 2008, the Source Selection Authority selected ITP as the offeror that provided the best value to the government. The contract was awarded to ITP on December 29, 2008.

On December 31, 2008, Advanced Technologies and Laboratories International, Inc. ("ATL"), another disappointed bidder, filed a protest with the Small Business Administration challenging ITP's financial and managerial qualifications for the award and asserting that ITP's subcontractor, Wackenhut, was only an "ostensible" subcontractor in that Wackenhut, rather than ITP, would be the business entity principally responsible for the management and performance of the contract. The protest was denied on January 28, 2009.

On January 12, 2009, ATL also filed a protest with the Government Accountability Office asserting that DOE: (1) had not properly mitigated or disclosed organizational conflicts of interest involving ITP, Wackenhut, and DOE prior to the beginning of the procurement; (2) had incorrectly assessed ATL's and ITP's proposed costs; and (3) had improperly evaluated ITP's and ATL's technical proposals. In response to ATL's protest, DOE agreed to take corrective action to clarify and, where appropriate, resolve the alleged deficiencies in its proposal evaluations. DOE further agreed to document its findings

and issue a new source selection decision.  Accordingly, on February 19, 2009, ATL withdrew its protest.

As part of its corrective action, the Project Team reconvened and reevaluated the proposals with respect to past performance and cost and reconsidered potential organizational conflicts of interest issues.  In reevaluating past performance, the Project Team determined that no additional current and relevant past performance information was available for any of the offerors.  Consequently, no changes were made to the past performance ratings.

In reevaluating cost, the Project Team reviewed the cost realism analysis for each of the offerors in accordance with the solicitation and the Source Evaluation Plan and developed a probable cost estimate for each of the offerors based on the information provided in Volume II (Technical and Management) and Volume III (Cost) of each proposal. Beginning with plaintiff's proposal, the Project Team determined that plaintiff's proposed labor categories and skill mix were consistent with its technical approach, but concluded that plaintiff's overall quantity of hours was low and failed to include all necessary labor categories.  The Project Team accordingly added five new labor categories and **[redacted]** direct labor hours to plaintiff's proposal, thereby increasing plaintiff's direct labor hours from **[redacted]** to **[redacted]**.  In addition, the Project Team determined that it was necessary to increase plaintiff's proposed labor rates in certain labor categories (in the areas of Property Specialist, Munitions Specialist, and Armorer) to meet the minimum wage rates set by the U.S. Department of Labor.  The Project Team thus increased plaintiff's proposed cost of $4,937,720 by $1,004,607, establishing a total probable cost of $5,942,327.

The Project Team made similar adjustments to ITP's proposal. Recognizing that ITP intended to hire individuals from Wackenhut's staff, the Project Team increased ITP's proposed direct labor rates to reflect the current average labor rates by labor category.  In addition, the Project Team increased ITP's proposed direct labor hours by **[redacted]** (from **[redacted]** to **[redacted]**) to account for a shortage of labor hours in certain labor categories (in the areas of Instructor, Opposition Force,

Instructional Systems Designer, Logistics and Property, Munitions, Armorers, and Controller).  Finally, the Project Team increased ITP's proposed labor hours for the Wackenhut subcontract by **[redacted]** (from **[redacted]** to **[redacted]**).  The Project Team thus increased ITP's proposed cost of $2,372,422 by $1,621,467, arriving at a total probable cost of $3,993,889.

As a final step in the agency's corrective action, the contracting officer performed a detailed analysis of the potential for organizational conflicts of interest in the procurement.  Based on her analysis, the contracting officer determined that neither Wackenhut's performance of the OST support services contract nor ITP's performance of the POIO contract provided ITP with nonpubllic information that would give it a competitive advantage in the procurement.[3]   The contracting officer thus concluded that no organizational conflicts of interest existed that would preclude an award of the contract to ITP.

The Project Team documented its conclusions in a revised final evaluation report on May 19, 2009.[4]   Following a June 4, 2009,

---

[3] At the time of the solicitation, ITP was serving as the incumbent contractor for DOE's Program Office of Independent Oversight—an audits/assessments contract that required ITP to oversee and review the performance of other OST contractors.

[4] The revised report contained the following overall evaluation results:

| Evaluation Criteria | ITP | | PAI | |
| --- | --- | --- | --- | --- |
| | Adjectival Rating | Score/ Percentage | Adjectival Rating | Score/ Percentage |
| Technical Approach | Good | 270/90% | Satisfactory | 240/80% |
| Key Personnel | Excellent | 282/94% | Excellent | 279/93% |
| Corporate Experience | Excellent | 300/100% | Good | 261/87% |
| Past Performance | Excellent | 100/100% | Excellent | 100/100% |
| Total Score | Excellent | 952/95% | Good | 880/88% |

(continued...)

briefing, the Source Selection Authority selected ITP as the successful offeror based on its best value to the government due to its highest technical rating and lowest probable cost. The top four offerors were ranked as follows:

1. Innovative Technology Partnerships, LLC
2. PAI Corporation
3. Technical Field Engineering, Inc.
4. Advanced Technologies and Laboratories International, Inc.

DOE notified ITP and the other offerors of the new source selection decision on June 17, 2009, and thereafter concluded written debriefings.


Plaintiff filed suit in this court on June 23, 2009. Plaintiff now seeks a court order directing DOE to: (i) disqualify ITP from the award of the support services contract; (ii) modify the pricing adjustments DOE made to plaintiff's proposal; and (iii) make a new source selection from among the remaining offerors.

## DISCUSSION

This court's bid protest jurisdiction is set forth at 28 U.S.C. § 1491(b)(1) (2006), which authorizes the court "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The statute specifies that in addressing such an action, the court "may award any relief that [it] considers proper, including declaratory and injunctive relief," § 1491(b)(2), and further directs that "[i]n any action under this subsection, the court[] shall review the agency's decision pursuant to the standards set forth in [the Administrative Procedures Act]," § 1491(b)(4). Under this standard of

---

[4]/(...continued)

8

review, a procuring agency's decision must be upheld unless it is shown to be without any reasonable basis in fact or is erroneous as a matter of law. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Plaintiff challenges the instant procurement on essentially three grounds. First, plaintiff contends that DOE improperly handled the potential conflict of interest inherent in ITP's partnership with Wackenhut and maintains that ITP should consequently be excluded from the competition. Second, plaintiff asserts that DOE impermissibly considered the corporate experience of subcontractors in evaluating the proposals despite what plaintiff sees as the solicitation's limitation of that criterion to offerors. Third, plaintiff argues that DOE improperly conducted its cost realism analysis by unreasonably increasing plaintiff's direct labor hours and by arbitrarily adjusting plaintiff's labor rates. We address these issues in turn below.

A.

Plaintiff's primary argument is that the competitive integrity of the procurement was compromised through ITP's access to nonpublic information which gave ITP an unfair advantage in the procurement. In particular, plaintiff contends that ITP's and Wackenhut's roles as incumbent contractors gave ITP inside information regarding how Wackenhut and other contractors planned and performed particular OST activities. In plaintiff's view, such cost and staffing data provided ITP with a clear advantage in responding to the sample task orders set forth in the solicitation. Plaintiff thus argues that the procurement was tainted by an organizational conflict of interest—specifically, unequal access to information favoring a particular offerer—that now requires the court to declare the award to ITP unlawful.

The contracting officer addressed this very issue in a memorandum titled "Organization Conflict of Interest Analysis" issued on June 8, 2009, in response to ATL's January 2009 protest before the Government Accountability Office. In her memorandum, the contracting officer noted that she had reviewed each offerer's

submissions regarding any potential organizational conflicts of interest (a certification was required as part of each proposal) and had determined that no significant potential conflict existed with respect to any offeror. Specifically, the contracting officer determined that although ITP and Wackenhut had access to nonpublic information through their existing contracts, such information had no competitive value in the instant procurement. With respect to ITP, the contracting officer found that the information to which it had access involved constantly changing requirements and thus was of little use as it was quickly outdated.[5] With respect to Wackenhut, the contracting officer similarly determined that the information to which it had access was not germane to the requirements addressed in the solicitation's first two sample task orders and in the case of the third sample task order (relating to the contractor's proposed transportation utilization program) had been effectively offset by other information disclosed in the solicitation.[6] The contracting officer further observed that both she and the technical representative regarded the information released by DOE

---

[5] The contracting officer additionally noted that ITP had installed a "firewall" between its employees who were involved in OST operational readiness training and its senior management, so that senior management was prevented from acquiring any information regarding the conduct of the POIO contract or from exercising any influence over the ITP employees in their performance of that contract.

[6] The contracting officer identified four nonpublic documents to which Wackenhut had access as the incumbent contractor for the OST support services contract: the OST Playbook (an assessment of OST federal agent performance), the OST Site Security Plan, the Contractor Transportation Utilization Program Standard Operating Procedures, and the OST Lesson Plans. The contracting officer concluded that neither the playbook nor the site security plan was competitively useful, however, because neither contained any information that would be relevant to the three sample task orders. The contracting officer additionally concluded that although the standard operating procedures for the Contractor Transportation Utilization Program were relevant to the third sample task order, that information had been effectively offset by the disclosure of OST's Policy Number 8.06B, which described the standards of conduct for contractors operating OST equipment on over-the-road transportation. Finally, the contracting officer observed that security concerns associated with the OST lesson plans precluded their release to <u>any</u> offeror, including to ITP by Wackenhut. The contracting officer noted that Wackenhut had indeed complied with the security restrictions in its contract with OST: "After further review of [Wackenhut's] award fee reports, I found no evidence to suggest that [Wackenhut] ever disclosed [the information contained in the OST Lesson Plans] to any entity outside of [the National Nuclear Security Administration]."

to be sufficient to guide offerors in preparing an effective technical proposal. Based on the foregoing, the contracting officer concluded that no organizational conflicts of interest existed that would preclude an award to ITP for the support services contract.

Plaintiff now urges the court to reject the contracting officer's conclusion on the grounds that: (1) the analysis should have been conducted prior to the issuance of the solicitation and was therefore untimely; (2) the remedial steps taken by the contracting officer to address any potential conflicts of interest were not approved by the chief of the contracting office and were thus unauthorized; and (3) the existence of a conflict is clear on the face of ITP's proposal. In support of the first point, plaintiff asserts that the contracting officer is required under the Federal Acquisition Regulations ("FAR") to analyze planned acquisitions in order to: "(1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. (FAR) § 9.504(a). Compliance with the FAR, plaintiff maintains, would have required the contracting officer to have undertaken her analysis more than a year earlier than she did, i.e., by April 2008—the date when DOE first became aware that ITP intended to partner with Wackenhut in competing for the successor OST support services contract. Plaintiff presumes that such an earlier intervention would have prompted heightened attention to the likelihood of an organizational conflict of interest.

Plaintiff's argument, however, ignores the fact that the contracting officer did indeed act in a timely and comprehensive manner to address any potential problems associated with ITP's and Wackenhut's participation in the instant procurement. As the contracting officer noted in her analysis, Global Engineering & Technology, Inc., a potential bidder, had filed an agency-level protest in July 2008 (a date that preceded the issuance of the solicitation), alleging unequal access to information and thus an unfair competitive advantage to any offeror that partnered with Wackenhut. In particular, Global Engineering maintained that the solicitation, as then proposed, did not provide

sufficient information regarding the staffing levels necessary to support the sixteen task areas the offerors' were directed to address in their technical proposals.[2/]

In response to this concern, the contracting officer took a number of corrective steps, the most significant of which was to modify the required scope of the offerors' technical proposals.   The contracting officer explained this point in her analysis as follows:

> [I]n light of the [Global Engineering] protest, I fundamentally altered the solicitation requirements. Instead of requiring all offerors to propose on 15 of the 16 [Performance Work Statement] Task Areas over a five year period of performance, as initially envisioned . . . offerors now only had to address three Sample Task Orders covering a 12 month period of performance or less.   For example, Task Order 1 entitled "Conduct Agent Candidate Training (ACT)," set forth the performance objectives of ACT and specifically identified the applicable Task Areas. In this case, offerors were instructed to address seven Task Areas (Task Areas 1 through 7) as part of their technical approach for Task Order 1.   For Task Order 2, entitled "Conduct Operational Readiness Training (ORT)," offerors were provided the performance objectives for ORT and instructed to address eight Task Areas (Task Areas 1 through 7 and 9).   For Task Order 3, not only did I provide offerors with very specific information for three fictitious transportation scenarios, I provided offerors information regarding the number of drivers and transportation assets

---

[2/] The Performance Work Statement identified the 16 task areas as follows: (1) paramilitary training programs support; (2) analysis, design, and development of training curricula and training plans; (3) logistical support of OST programs; (4) property management; (5) equipment operators; (6) munitions support; (7) armorer support; (8) mission related work; (9) shipping, receiving, tagging, storage, and issuance of equipment and supplies; (10) contractor transportation and utilization program; (11) quality assurance program; (12) safety program; (13) program and management analysis; (14) resources and business management support; (15) fleet vehicle management support; and (16) safeguards and security.

needed to complete each scenario as well as trip duration and locations.

In addition to narrowing the scope of the offerors' technical proposals, the contracting officer also provided offerors with a historical twelve-month snapshot of the direct productive labor hours, by location, for each of the solicitation's task areas. Further, the contracting officer provided offerors with an estimated training calendar for OST for the twelve-month period from December 2008 to December 2009, and with the Lesson Plan Master Listing which contained a detailed list of the types of training that offerors would be expected to provide. Finally, the contracting officer revised the solicitation to require all offerors to certify as part of their proposals that their participation in the procurement did not give rise to any organizational conflicts of interest. In light of these actions, plaintiff's argument that the contracting officer did not act in a timely manner to address concerns regarding unequal access to competitively useful information is simply not correct.

Nor can we accept plaintiff's contention that the award to ITP is unlawful because the contracting officer failed to obtain the requisite authorization for the adjustments she made to the solicitation in light of Global Engineering's protest. In plaintiff's view, the FAR requires that any such adjustments be approved by a senior-level procurement official. The regulation to which plaintiff refers reads as follows:

> (b) If the contracting officer decides that a particular acquisition involves a significant potential organizational conflict of interest, the contracting officer shall, before issuing the solicitation, submit for approval to the chief of the contracting office (unless a higher level official is designated by the agency)—
>
> (1)  A written analysis, including a recommended course of action for avoiding, neutralizing, or mitigating the conflict . . . .

FAR § 9.506.

Plaintiff's argument, which would apply the approval authority requirement of FAR § 9.506(b) to the adjustments the contracting officer made to the draft solicitation in June 2008, overreads the regulation. The focus of this regulation, as we read it, is on a solicitation that, as issued, would present significant potential organizational conflicts of interest unless remedial steps are undertaken to avoid, neutralize, or mitigate those conflicts.  As the subsequent FAR provision makes clear, "potential organizational conflicts of interest are normally resolved by imposing some restraint, appropriate to the nature of the conflict, upon the contractor's eligibility for future contracts or subcontracts." FAR § 9.507-1.  In other words, it is the "corrective" restraints introduced into a solicitation to address potential organizational conflicts of interest that are the concern of FAR § 9.506(b), not substantive adjustments to the content of the solicitation before its final release.

This is not the situation we face here.  As the contracting officer explained in her analysis, she "took a number of steps to address potential [organizational conflicts of interest] during the pre-solicitation phase" and added that it is "worthwhile to note that the draft OST solicitation in June 2008 was significantly different than the final solicitation."   As to the final solicitation, the contracting officer "determined that no [organizational conflict of interest] exists . . . which would preclude an award to ITP."  FAR § 9.506(b) simply does not apply to the contracting officer's actions.

Turning then to the third and final argument in support its claim of unequal access to information, plaintiff challenges the contracting officer's determination that no organizational conflicts of interest existed that would preclude an award to ITP.  According to plaintiff, it is clear from the opening paragraph of ITP's response to the first and second sample task orders that ITP had a significant advantage through its own and Wackenhut's status as incumbent OST contractors.[8]  This

---

[8]  The opening paragraph of ITP's response to Task Order 1, which is essentially identical to the opening paragraph of its response to Task Order 2, reads as follows:

Upon successful completion of transition, ITP will subcontract with [Wackenhut]
(continued...)

paragraph, however, does nothing more than declare that ITP intends to assign responsibility for the performance of the task orders to its subcontractor, Wackenhut, and that Wackenhut, in turn, will engage the services of individuals whose prior experience includes "all of the functions associated with this [task order's] requirements." The paragraph, in other words, contains nothing to support a claim of unequal access to information.

The fact that Wackenhut has performed activities identified in the solicitation's sample task orders and therefore can be expected to have a more informed understanding of those activities than a first-time contractor undoubtedly offers ITP some competitive advantage. But such an advantage is the product of experience rather than the result of having access to nonpublic information garnered from the government through a special relationship. Under prevailing case law, only information of the latter sort is regarded as yielding an unfair competitive advantage that might taint a procurement; information that draws upon a contractor's own experience is not so regarded. This point is well explained in ARINC Engineering Services, LLC v. United States, 77 Fed. Cl. 196, 203–204 (2007), as follows:

> [F]or an organizational conflict of interest to exist based upon unequal information, there must be something more than mere incumbency, that is, indication that:  (i) the awardee was so embedded in the agency as to provide it with insight into the agency's operations beyond that which would be expected of a typical government

---

[8/](...continued)
who will employ Mr. Scott Taylor, the current Assistant General Manager for Training, as the Training Program Manager.  Mr. Taylor has performed all functions associated with this activity for the past two years and will be the Task Manager for this [task order].  Also, upon contract award and successful completion of transition, ITP will hire the current Assistant General Manager for Logistics, Mr. James (Eddie) Gordon, as the Logistics Program Manager.  Mr.  Gordon has performed all of the functions associated with this [task order's] requirements for the incumbent, [Wackenhut], since January of 2008 . . . .  Mr. Gordon will support the [task order] Manager, Mr. Taylor for this effort.

> contractor; (ii) the awardee had obtained materials related to the specifications or statement of work for the instant procurement; or (iii) some other "preferred treatment or . . . agency action" has occurred.

(Footnotes omitted.)   Plainly, the instant case does not involve nonpublic information within the meaning of the organizational conflict of interest rules.

## B.

Plaintiff's second objection to the procurement is that DOE erred by considering the corporate experience of subcontractors in evaluating the proposals, thereby awarding ITP an "Excellent" rating for that criterion due in part to Wackenhut's successful prior performance history.  Plaintiff contends that under the terms of the solicitation, information detailing corporate experience was to be submitted by each "offeror"—a term which, according to plaintiff, is defined in the solicitation as "the single legal entity submitting the offer."  Thus, in plaintiff's view, DOE should have considered only ITP's corporate experience and not also the corporate experience of Wackenhut.

Plaintiff's argument is without merit.   Section L of the solicitation, titled "Instructions, Conditions, and Notices to Offerors," defines the term "offeror" as follows:

> The term "Offeror" as used in this Section L refers to the single legal entity submitting the offer as a "Contractor team arrangement" as that term is defined in FAR 9.601. The Offeror may be preexisting or newly formed for the purposes of competing for this Contract.

In the following paragraph, the solicitation employs this definition of the term "offeror" in the context of the solicitation's corporate experience and past performance criteria:

> The Offeror shall submit information on Corporate Experience and past performance . . . of all those companies comprising its "Contractor team arrangement" that will perform major or critical aspects of the Performance Work Statement (PWS) Task Areas . . . .

The term "contractor team arrangement" is in turn defined in FAR § 9.601 as an arrangement in which:

> (1)  Two or more companies form a partnership or joint venture to act as a potential prime contractor; or
>
> (2)  A potential prime contractor agrees with one or more other companies to have them act as its subcontractors under a specified Government contract or acquisition program.

Based on these provisions, the court can discern no basis for concluding that DOE erred  in considering ITP's experience to include the relevant past experience of its subcontractor Wackenhut.  Plaintiff has offered no plausible argument to the contrary.

## C.

In its third and final ground for challenging the contract award, plaintiff asserts that DOE's cost realism analysis was arbitrary and capricious because the contracting officer:  (1) arbitrarily increased plaintiff's cost proposal by **[redacted]** direct labor hours, essentially adding eleven full-time equivalent personnel despite the technical representative's finding that plaintiff had omitted only five direct labor categories and despite the fact that plaintiff's direct labor hours as originally proposed were virtually identical to ITP's (**[redacted]** vs.**[redacted]**); and (2) failed to adjust plaintiff's proposed cost downward in certain labor categories to reflect minimum wage rates set by the U.S. Department of Labor, despite having adjusted the proposed cost upward in other labor categories in accordance with those same

minimum wage rates.[9]  Plaintiff requests that the court direct that DOE, in reevaluating the proposals, consider plaintiff's proposal as it was initially submitted (i.e., with **[redacted]** direct labor hours rather than the adjusted **[redacted]**) and account for the minimum wage rates set by the U.S. Department of Labor with the appropriate downward cost adjustment.  Plaintiff identifies that amount as $214,000.[10]

In assessing the reasonableness of DOE's cost realism analysis, we begin with the principle that "[d]ecisions on cost realism are within the agency's sound discretion and expertise" and will not be overturned

---

[9] In its initial brief, plaintiff offered a third basis for its assertion that DOE's cost realism analysis was arbitrary and capricious.  Specifically, plaintiff noted that the technical representative had found that plaintiff's responses to the first and second sample task orders failed to account for manning the OST Exercise Control Center when conducting training exercises.  Plaintiff argued, however, that the technical representative's assessment was predicated on a "clarification" that did not appear in the Administrative Record and that required nonpublic knowledge of Wackenhut's support staffing—i.e., that plaintiff had failed to propose sufficient staffing for the Exercise Control Center because it was not provided with the requisite information in the procurement to do so.

As defendant observed in its cross-motion, however, all offerors, including plaintiff, were directly notified of the Exercise Control Center's manning requirements in Section 6.1.2.6 of the Performance Work Statement, which stated that "[t]he contractor shall provide support for the operation of the Exercise Control Center (ECC) fixed site at [Transportation Safeguards Training Site] and mobile sites, as required."  In addition, defendant pointed out that DOE clarified this requirement during the solicitation's question-and-answer session as follows:

Question: Operational support for Exercise Control Center (ECC) fixed and mobile site. Can the government provide the staffing criteria for the ECCs?

Response: Typically two people man the ECC whenever on site or off site training is being conducted.

We thus conclude that plaintiff's argument on this point is without merit.

[10] In calculating that amount, plaintiff explains that it proposed a total of 32,000 direct labor hours in three labor categories for which it had overstated labor rates (i.e., an overstatement of $6.21 per hour for the position of Administrative Assistant, an overstatement of $3.67 per hour for the position of Tactic Trainer, and an overstatement of $3.67 per hour for the position of Controller & Range Safety Officer) and marked-up these direct labor hours with a multiplier of **[redacted]**.

18

if they "reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations." <u>Halter Marine, Inc. v. United States</u>, 56 Fed. Cl. 144, 172 (2003). Applying this standard, we are unable to conclude that DOE's cost realism analysis was either arbitrary or capricious. In making probable cost adjustments, DOE employed the following process:

1. When a unique technical approach was presented, the Project Team utilized the technical representative's expert judgment to adjust an offeror's proposed staffing or other direct costs to reflect any additions or reductions to realistic levels necessary to accomplish the unique technical approach.

2. In the absence of a unique technical approach or other evidence explaining the sufficiency of the proposed direct productive labor hours, the Project Team adjusted an offeror's staffing or other direct costs based on the technical representative's expert judgment and/or the government's baseline.

3. In the event that an offeror did not address a certain requirement or labor category in its cost proposal, the Project Team adjusted the offeror's direct productive labor hours or other direct costs based on the offeror's overall approach to fulfilling the task order requirements (<u>e.g.</u>, Can a comparable labor category with sufficient direct productive labor hours be used to fulfill the requirement?), the technical representative's expert judgment, and/or the government's baseline.

The record indicates that the Project Team's addition of **[redacted]** direct labor hours to plaintiff's cost proposal was the result of the Project Team's careful analysis using the process described above. In particular, the Project Team determined that plaintiff failed to propose any direct labor hours for the following necessary labor categories:

Opposition Force, Exercise Control Center Operator, Instructional Systems Designer,
Planning Specialist, and Logistics Carpenter.  Plaintiff has failed to identify any fault with that analysis[11/] and we can find none.

Plaintiff's second challenge to DOE's cost realism analysis is equally unavailing.  DOE increased plaintiff's proposed costs in the labor categories for which plaintiff offered less than minimum wage rates based upon the clear requirements provided in the solicitation.  The solicitation expressly informed offerors, for example, that they were required to comply with the wage requirements of the U.S. Department of Labor.  Additionally, the solicitation incorporated FAR § 52.222-41, a provision which implemented the Service Contract Act of 1965, 41 U.S.C. §§ 351 <u>et seq.</u> (2006) by requiring that each service employee employed in the performance of the contract "be paid not less than the minimum monetary wages and . . .  be furnished fringe benefits in accordance with the wages and fringe  benefits determined by the Secretary of Labor."  The solicitation did not, however,  prohibit an offeror from proposing labor wage rates above the minimum wage.  DOE accordingly had no basis to reduce costs offered by plaintiff in excess of the minimum wage rates.

Nor would the downward adjustment to its cost proposal that plaintiff seeks ultimately affect the resolution of this case.  Even assuming that DOE had committed some error with respect to its cost realism analysis, plaintiff's protest would nevertheless fail because plaintiff cannot demonstrate a necessary element for obtaining injunctive relief: a showing that "there was a substantial chance it would

---

[11/] Plaintiff's observation that it proposed virtually the same number of direct labor hours as ITP does not, as plaintiff maintains, confirm the reasonableness of plaintiff's staffing.  As an initial matter, the technical representative evaluated the reasonableness of an offeror's proposed staffing based not on a comparison with the proposals of other offerors, but on a comparison with the agency's internally formulated baseline and on an assessment of how well the offeror's proposed staffing fit with the offeror's own technical approach.  In addition, plaintiff is mistaken in its assertion that ITP's proposed labor hours were not subject to adjustment; the agency added **[redacted]** direct labor hours to ITP's proposal.  The fact that plaintiff and ITP initially proposed a similar number of direct labor hours is thus irrelevant to the analysis.

have received the contract but for that error." <u>Four Points by Sheraton v. United States</u>, 66 Fed. Cl. 776, 783 (2005). The solicitation provided that an offeror's technical approach to the sample task orders, key personnel, corporate experience, and past performance were significantly more important than cost. In its decision, the Source Selection Authority explained the selection of ITP as follows:

> While I believe that ITP's superior technical proposal would be worth the premium of a much higher cost, the fact that ITP offers the lowest probable cost makes its selection an easy choice. Even if I were to compare ITP's probable costs against all other Offerors' proposed costs, without any probable cost adjustments, ITP would still be the highest technically rated Offeror and, with the exception of [Technical Field Engineering, Inc.], have the lowest cost. For these reasons, I find that ITP's proposal offers the best value to the Government, and I select ITP for award.

In addition, the downward adjustment plaintiff seeks would result in a decrease, by plaintiff's own calculation, of $214,000. But plaintiff's proposed cost of $4,937,720, even without adjustments, is almost $1 million more than ITP's total probable cost, with DOE adjustments, of $3,993,889. Plaintiff, in other words, would not have been awarded the contract regardless of whether its proposed costs remained unaltered.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for injunctive relief is denied and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record are granted. Accordingly, the clerk is directed to enter judgment dismissing plaintiff's complaint.

  s/John P. Wiese
John P. Wiese
Judge
